**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBIN JOHNSON d/b/a CG JOHNSON & COMPANY; JAMES QUINN; FAHMIA, Inc.; and PRINZO & ASSOCIATES, LLC; individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JPMORGAN CHASE BANK, N.A., doing business as CHASE BANK; JPMORGAN CHASE & CO.; and DOES 1 through 100,<br><br>Defendants. | 20-cv-4100 (JSR) |
| JAMES QUINN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SIGNATURE BANK; and DOES 1 through 100,<br><br>Defendants. | 20-cv-4144 (JSR) |
| FAHMIA, Inc., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MUFG AMERICAS HOLDING CO.; MUFG UNION BANK, N.A.; and DOES 1 through 100,<br><br>Defendants. | 20-cv-4145 (JSR) |

FAHMIA, Inc., individually and on behalf of all
others similarly situated,

               Plaintiff,

               v.

CITIBANK, N.A.; CITIGROUP INC.; and DOES 1
through 100,

               Defendants.

20-cv-4146 (JSR)

ROBIN JOHNSON d/b/a CG JOHNSON &
COMPANY; JAMES QUINN; FAHMIA, Inc.; and
PRINZO & ASSOCIATES, LLC, individually and on
behalf of all others similarly situated,

               Plaintiff,

               v.

JPMORGAN CHASE BANK, N.A., d/b/a CHASE
BANK; and JP MORGAN CHASE & CO.,

               Defendants.

20-cv-4858 (JSR)

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' JOINT MOTION TO DISMISS FOR FAILURE TO
STATE A CLAIM AND LACK OF SUBJECT-MATTER JURISDICTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 2

    A.    The SBA's Section 7(a) Program ................................................. 2

    B.    The CARES Act and Creation of the Paycheck Protection Program ................... 4

    C.    The SBA's Implementation of the PPP ................................................. 5

    D.    Plaintiffs Do Not Enter Into Compensation Agreements and Instead File These Lawsuits .................................................................................. 6

PROCEDURAL STANDARD ..................................................................................... 7

ARGUMENT ............................................................................................................... 7

I.    THE CARES ACT DOES NOT ENTITLE AGENTS TO FEES FROM LENDERS ................................................................................................... 7

    A.    The CARES Act Does Not Require Lenders to Pay Fees to Agents. ..................... 8

    B.    The CARES Act Directs the SBA to Implement the PPP Under the Section 7(a) Program, Which Has Clear Rules for Agent Compensation. ............. 9

    C.    Plaintiffs' Reliance on the IFR and the Information Sheet Is Misplaced. ........... 12

        1.    The IFR Does Not Entitle Agents to Receive Fees .................................. 12

        2.    The SBA Did Not Change Its Longstanding Agent Fee Regulations. ..................................................................................... 13

II.    THE DECLARATORY JUDGMENT ACT AND COMMON LAW CLAIMS SHOULD BE DISMISSED FOR ADDITIONAL REASONS. ....................................... 15

    A.    There Is No Private Right of Action to Enforce the CARES Act. ........................ 15

    B.    The Lack of a Private Right of Action Defeats Plaintiffs' Declaratory Judgment Claims .............................................................................. 17

    C.    The Lack of a Private Right of Action Defeats Plaintiffs' Common-Law Claims. ................................................................................................. 18

    D.    The Common-Law Claims Are Defective for Additional Reasons. ..................... 19

i

1.      Plaintiffs' Third-Party Beneficiary Breach-of-Contract Claims Fail........ 19

2.      Plaintiffs' Unjust Enrichment Claims Fail................................................. 21

3.      Plaintiffs' Conversion Claims Fail............................................................ 23

4.      Plaintiffs' Misappropriation Claims Against Chase Fail. ......................... 24

III.    THE CLAIMS FOR VIOLATIONS OF NEW YORK'S GBL § 349 FAIL.................... 24

A.    Plaintiffs Lack Statutory Standing to Bring Their GBL § 349 Claims................. 25

B.    Plaintiffs Cannot Satisfy Any of the Elements of a GBL § 349 Claim. ............... 25

IV.    THE CLAIM FOR VIOLATIONS OF CALIFORNIA'S UNFAIR
        COMPETITION LAW FAILS. .......................................................................... 28

V.     THE COMPLAINTS CANNOT STATE A CLAIM AGAINST THE HOLDING
        COMPANY DEFENDANTS. ............................................................................ 28

VI.    THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER CLAIMS
        BY FAHMIA AND PRINZO, WHO NEVER ASKED DEFENDANTS FOR
        FEES. ........................................................................................................... 29

CONCLUSION.................................................................................................... 30

APPENDIX: TABLE OF CLAIMS........................................................................... A-1

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                           **Page(s)**

*Aardwoolf Corp. v. Nelson Capital Corp.*,
    861 F.2d 46 (2d Cir. 1988)........................................................................................16, 19

*Aetna Life Ins. Co. v. Haworth*,
    300 U.S. 227 (1937)......................................................................................................7

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)................................................................................................15, 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................................7

*Astra USA, Inc. v. Santa Clara County*,
    563 U.S. 110 (2011)................................................................................................18, 20

*In re Bayou Hedge Funds Invest. Litig.*,
    472 F. Supp. 2d 528 (S.D.N.Y. 2007).........................................................................21

*Beckett v. Air Line Pilots Ass'n*,
    995 F.2d 280 (D.C. Cir. 1993)...............................................................................19, 20

*Bellikoff v. Eaton Vance Corp.*,
    481 F.3d 110 (2d Cir. 2007)...................................................................................16, 17

*Bibicheff v. PayPal, Inc.*,
    2020 WL 2113373 (E.D.N.Y. May 4, 2020) ...........................................................27, 28

*Broder v. Cablevision Systems*,
    418 F.3d 187 (2d Cir. 2005).........................................................................................18

*Bulger v. Royal Doulton, PLC*,
    2006 WL 3771016 (S.D.N.Y. Dec. 19, 2006) ............................................................24

*Bulluck v. Newtek Small Bus. Fin., Inc.*,
    808 F. App'x 698 (11th Cir. 2020) .............................................................................16

*Carson Optical, Inc. v. Prym Consumer USA, Inc.*,
    11 F. Supp. 3d 317 (E.D.N.Y. 2014) ..........................................................................24

*Chevron Corp. v. Naranjo*,
    667 F.3d 232 (2d Cir. 2012).........................................................................................18

*Christensen v. Harris County*,
    529 U.S. 576 (2000).....................................................................................................13

*Ciaramella v. Zucker*,
   2019 WL 4805553 (S.D.N.Y. Sept. 30, 2019)....................................................................30

*Citizens Against Casino Gambling in Erie Cty. v. Chaudhuri*,
   802 F.3d 267 (2d Cir. 2015)...............................................................................................10

*Coca-Cola N. Am. v. Crawley Juice, Inc.*,
   2011 WL 1882845 (E.D.N.Y. May 17, 2011) ....................................................................24

*Cook v. Ohio Nat'l Life Ins. Co.*,
   961 F.3d 850 (6th Cir. 2020) .............................................................................................20

*Corsello v. Verizon N.Y., Inc.*,
   18 N.Y.3d 777 (2012) ........................................................................................................21

*Crandal v. Ball, Ball & Brosamer, Inc.*,
   99 F.3d 907 (9th Cir. 1996) ...............................................................................................16

*Diamond Collection, LLC v. Underwraps Costume Corp.*,
   2018 WL 1832928 (E.D.N.Y. Apr. 16, 2018) ...................................................................24

*Doe No. 1 v. Putnam County*,
   344 F. Supp. 3d 518 (S.D.N.Y. 2018)................................................................................29

*Doe v. Blum*,
   729 F.2d 186 (2d Cir. 1984)...............................................................................................30

*Dragon Inv. Co. II LLC v. Shanahan*,
   854 N.Y.S.2d 115 (1st Dep't 2008) ...................................................................................22

*Empire State Pharm. Soc., Inc. v. Perales*,
   672 F. Supp. 146 (S.D.N.Y. 1987) .....................................................................................30

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)............................................................................................................13

*Flores v. EMC Mortg. Co.*,
   997 F. Supp. 2d 1088 (E.D. Cal. 2014)..............................................................................28

*Gale v. Int'l Bus. Mach. Corp.*,
   781 N.Y.S.2d 45 (2d Dep't 2004).......................................................................................27

*Gonzaga Univ. v. Doe*,
   536 U.S. 273 (2002)............................................................................................................17

*Goodyear Atomic Corp. v. Miller*,
   486 U.S. 174 (1988)............................................................................................................10

*Gorbaty v. Wells Fargo Bank, N.A.*,
   2012 WL 1372260 (E.D.N.Y. Apr. 18, 2012) ........................................................20

*Goshen v. Mut. Life Ins. Co. of New York*,
   98 N.Y.2d 314 (2002) ............................................................................................25

*Grochowski v. Phoenix Const.*, 318 F.3d 80 (2d Cir. 2003) ..........................................18

*Hillside Metro Assocs., LLC* v. *JPMorgan Chase Bank, Nat. Ass'n*,
   747 F.3d 44 (2d Cir. 2014) ...............................................................................19, 20

*Hudson & Broad, Inc. v. J.C. Penney Corp.*,
   2013 WL 3203742 (S.D.N.Y. June 18, 2013) ......................................................22

*J.P. Plumbing Corp. v. Born to Build Const. Corp.*,
   27 N.Y.S.3d 203 (2d Dep't 2016) ........................................................................21

*In re Joint E. & S. Dist. Asbestos Litig.*,
   14 F.3d 726 (2d Cir. 1993) ....................................................................................18

*Kaye v. Grossman*,
   202 F.3d 611 (2d Cir. 2000) ..................................................................................21

*Keene Corp. v. United States*,
   508 U.S. 200 (1993) ................................................................................................8

*King's Gym Complex, Inc. v. Phila. Indem. Ins. Co.*,
   433 F. Supp. 2d 256 (N.D.N.Y. 2006) ..................................................................30

*Komlossy v. Faruqi & Faruqi, LLP*,
   2017 WL 722033 (S.D.N.Y. Feb. 23, 2017) .........................................................23

*Kommer v. Bayer Consumer Health*,
   252 F. Supp. 3d 304, 311 (S.D.N.Y. 2017) ..........................................................26

*Kwikset Corp. v. Superior Court*,
   51 Cal. 4th 310 (2011) ..........................................................................................28

*In re Libor-Based Fin. Instr. Antitrust Litig.*,
   2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015) ..................................................25, 26

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) .......................................................26

*Lopez v. Jet Blue Airways*,
   662 F.3d 593 (2d Cir. 2011) ..................................................................................16

*Lyng v. Payne*,
   476 U.S. 926 (1986) ..............................................................................................12

*Lynn v. Maida*,
  97 N.Y.S.3d 46 (1st Dep't 2019) ............................................................23

*Mangindin v. Wash. Mut. Bank*,
  637 F. Supp. 2d 700 (N.D. Cal. 2009) ....................................................21

*Marcus v. AT&T Corp.*,
  138 F.3d 46 (2d Cir. 1998)......................................................................22

*McKell v. Wash. Mut., Inc.*,
  142 Cal. App. 4th 1457 (2006) ...............................................................23

*Mount v. PulsePoint, Inc.*,
  684 F. App'x 32 (2d Cir. 2017) ..............................................................21

*Mumin v. Uber Techs., Inc.*,
  239 F. Supp. 3d 507 (E.D.N.Y. 2017) ....................................................23

*N. Am. Olive Oil Ass'n v. D'Avolio Inc.*,
  2020 WL 2079421 (E.D.N.Y. Apr. 30, 2020) ........................................24

*Nat'l Air Cargo Grp., Inc. v. Maersk Line Ltd.*,
  2019 WL 4735426 (S.D.N.Y. Sept. 27, 2019).........................................24

*O'Neill v. Standard Homeopathic Co.*,
  346 F. Supp. 3d 511 ...................................................................................7

*Olmsted v. Pruco Life Ins. Co.*,
  283 F.3d 429 (2d Cir. 2002)....................................................................16

*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*,
  150 Cal. App. 4th 384 (2007) .................................................................23

*Profiles, Inc. v. Bank of Am. Corp.*,
  2020 WL 1849710 (D. Md. Apr. 13, 2020) ...........................................15, 16, 17

*Rosenberg v. XM Ventures*,
  274 F.3d 137 (3d Cir. 2001)....................................................................12

*Royal Servs., Inc. v. Maint., Inc.*,
  361 F.2d 86 (5th Cir. 1966) ....................................................................16

*Schilling v. Rogers*,
  363 U.S. 666 (1960)............................................................................17, 18

*Schroeder v. Pinterest Inc.*,
  17 N.Y.S.3d 678 (1st Dep't 2015) ..........................................................22

*Spagnola v. Chubb Corp.*,
   574 F.3d 64 (2d Cir. 2009) ..............................................................................25, 26

*Swain v. CACH, LLC*,
   699 F. Supp. 2d 1117 (N.D. Cal. 2009) ......................................................................28

*Tasini v. AOL, Inc.*,
   851 F. Supp. 2d 734 (S.D.N.Y. 2012) ........................................................................26

*Taylor v. Vt. Dep't of Educ.*,
   313 F.3d 768 (2d Cir. 2002) .......................................................................................12

*Traffix, Inc. v. Herold*,
   269 F. Supp. 2d 223 (S.D.N.Y. 2003) ........................................................................23

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013) ......................................................................................................8

*Wright v. Publishers Clearing House, Inc.*,
   — F. Supp. 3d —, 2020 WL 729884 (E.D.N.Y. Feb. 13, 2020) ...............................25

*In re Zinc Antitrust Litig.*,
   155 F. Supp. 3d 337 (S.D.N.Y. 2016) ........................................................................29

**Statutes**

15 U.S.C. § 636(a) .......................................................................................2, 9, 10

15 U.S.C. § 636(a)(36)(B) .......................................................................2, 4, 9, 11

15 U.S.C. § 636(a)(36)(P)(i) .............................................................2, 4, 8, 11, 22

15 U.S.C. § 636(a)(36)(P)(ii) ..................................................................2, 4, 8

15 U.S.C. § 642 .........................................................................................3, 9

15 U.S.C. § 650 ..........................................................................................16

15 U.S.C. § 9005 ..........................................................................................4

28 U.S.C. § 2201 .........................................................................................17

Paycheck Protection Program and Health Care Enhancement Act § 101(a), Pub.
   L. 116-139 (2020) ........................................................................................4

Cal. Bus. & Prof. Code § 17200 ...................................................................28

N. Y. Gen. Bus. Law § 349 ...............................................................24, 25, 26

**Regulations**

13 C.F.R. § 103.1 ..............................................................................................2, 3, 12

13 C.F.R. § 103.2 ..............................................................................................2, 5, 14

13 C.F.R. § 103.5(a) ........................................................................................1, 3, 9, 10

13 C.F.R. § 103.5(b) ........................................................................................3, 9, 30

**Other Administrative Materials**

Final Rule, Standards for Conducting Business with SBA, 61 Fed. Reg. 2,679
   (Jan. 29, 1996)..........................................................................................................3

Interim Final Rule, Express Loan Programs; Affiliations Standards, 85 Fed. Reg.
   7,622 (Feb. 10, 2020)............................................................................................3, 14

Interim Final Rule, Business Loan Program Temporary Changes; Paycheck
   Protection Program, 85 Fed. Reg. 20,811 (Apr. 15, 2020) ....................................5, 6, 9, 12, 13

**Other Materials**

Restatement (First) of the Law of Restitution................................................................10

Restatement (Second) of the Law of Agency ........................................................10, 11

## INTRODUCTION

Plaintiffs are accountants that allegedly assisted small businesses in applying for loans under the Paycheck Protection Program ("PPP") administered by the Small Business Administration ("SBA").  Longstanding SBA regulations require an agent to "execute and provide to SBA a compensation agreement" signed by the lender, agent, and applicant *before* it may receive a fee "in any matter involving SBA assistance."  13 C.F.R. § 103.5(a).  This requirement promotes the SBA's twin objectives of allowing lenders to choose with whom they do business and preventing fraud and abuse by unscrupulous or unnecessary agents.

Plaintiffs do not allege that they complied with this requirement or that they made any attempt to do so—because they cannot.  Instead, Plaintiffs claim that a lender must pay any self-proclaimed agent part of the lender's loan processing fee.  Plaintiffs contend this is true even though the lender Defendants did not request their services, did not agree to pay Plaintiffs a fee, and (in some cases) did not even know Plaintiffs were allegedly assisting PPP applicants.  In effect, Plaintiffs ask this Court to sanction their effort to dodge the regulatory prerequisites that agents must satisfy before they may receive fees "in any matter involving SBA assistance."  *Id.*

That dodge should receive short shrift from this Court.  The new SBA regulation upon which Plaintiffs rely provides merely that *if* an agent receives a fee, that fee must be paid by the lender  and must not exceed a certain percentage of the loan amount.  The SBA did not require lenders to pay self-declared agents a portion of their lender fees—and if it had, the agency would have exceeded its authority.  Nor did the SBA revoke its requirements giving lenders freedom to choose with whom they do business or obliging agents, lenders, and applicants to enter into "a compensation agreement" before agents may receive a fee.  13 C.F.R. § 103.5(a).  To the contrary, Congress directed the SBA to implement the PPP "under the same terms, conditions,

and processes" as under the agency's other small business loan programs—including the compensation agreement requirement.  15 U.S.C. § 636(a)(36)(B).

The central premise of the Complaints—that Plaintiffs are entitled to the maximum permissible agent fees under the CARES Act simply by claiming to have assisted PPP loan applicants—has no support in the statute or regulation on which they rely.  If Congress had wanted to ensure that agents involved in PPP loan applications were compensated for their efforts, it would have done so explicitly—as it did when it *required* the SBA to pay fees to *lenders* for making PPP loans under the CARES Act.  15 U.S.C. § 636(a)(36)(P)(i).  But Congress did not do that: the CARES Act's sole reference to agent fees authorizes the SBA only to *limit* those fees; it does not force lenders to pay fees to anyone claiming to be an agent.  *Id.* § 636(a)(36)(P)(ii).  For this and other reasons set forth below, and because Plaintiffs' causes of action independently fail as a matter of law, the Complaints should be dismissed with prejudice.

## BACKGROUND

### A.    The SBA's Section 7(a) Program

Congress created the SBA in 1953 to develop programs to encourage lending to small businesses.  Under the SBA's largest loan program, the "Section 7(a)" program, lenders make loans to small businesses, and the SBA guarantees a percentage of those loans if certain conditions are satisfied.  *See generally* 15 U.S.C. § 636(a).

Neither small businesses nor lenders must use "agents"[1] to help businesses submit Section 7(a) loan applications.  *See* 13 C.F.R. § 103.2(a).  Indeed, fewer than 3 percent of

---

[1] An "agent" is any "authorized representative, including an attorney, accountant, consultant, packager, lender service provider, or any other person representing an applicant or participant by conducting business with SBA."  13 C.F.R. § 103.1(a).

Section 7(a) borrowers use agents.  *See* 85 Fed. Reg. 7,622, 7,627 (Feb. 10, 2020).  But if they

elect to do so, the Small Business Act and Part 103 of the SBA's regulations[2] establish a

comprehensive scheme that agents must satisfy when "[p]reparing or submitting on behalf of an

applicant an application for financial assistance of any kind" from the SBA.  *Id.* § 103.1(b)(1);

*see also* 15 U.S.C. § 642 (requiring that a borrower disclose to the SBA the identity of, and

compensation paid to, any agent).

      For example, 13 C.F.R. § 103.5 establishes how the "SBA regulate[s] an Agent's fees

and provision of service."  The agent's compensation cannot exceed what the SBA deems

"reasonable."  *Id.* § 103.5(b).  And before an agent can receive a fee, the agent first "must

execute and provide to SBA a compensation agreement," which "governs the compensation

charged for services rendered or to be rendered to the Applicant or lender in any matter involving

SBA assistance."  *Id.* § 103.5(a).  These requirements have been in place since 1996.  *See* 61

Fed. Reg. 2,679, 2,682.

      The "SBA provides the form of compensation agreement . . . to be used by Agents."  13

C.F.R. § 103.5(a).  For Section 7(a) loans, agents must use the SBA's Form 159 Fee Disclosure

and Compensation Agreement.  *See* Ex. A.[3]  That agreement "must be completed and signed by

the SBA Lender and Applicant whenever an Agent is paid by either the Applicant or the SBA

Lender in connection with the SBA loan application."  *Id.* at 1.  It also requires the agent to make

certifications about the services to be performed and compensation to be paid or received in

connection with the loan.  *Id.* at 1–2.  And if the agent claims a fee above $2,500, the agent must

---

[2] Although the SBA modified some aspects of Part 103 in a February 2020 interim final rule, those modifications were rescinded by Section 1102(e) of the CARES Act.  This brief therefore cites the operative version of Part 103.

[3] All exhibits referenced in this brief are attached to the accompanying Declarations of Andrew Soukup and Sylvia E. Simson.

provide "1) a detailed explanation of the work performed; and 2) the hourly rate and the number of hours spent working on each activity." *Id.* Agents must provide this information "even if the compensation is charged on a percentage basis." *Id.* at 2.

These disclosures do more than deter unscrupulous agents from charging excessive fees. As the SBA's inspector general has observed, the SBA adopted 13 C.F.R. § 103.5 and Form 159 "to mitigate the risk associated with loan agent participation, and to protect program participants and taxpayers from fraud and abuse." Ex. H at 5.

**B.    The CARES Act and Creation of the Paycheck Protection Program**

The PPP is one component of the CARES Act, Pub. L. 116-136 (2020). The PPP made more than $600 billion in loans available to small businesses. *See* Paycheck Protection Program and Health Care Enhancement Act § 101(a), Pub. L. 116-139 (2020). In general terms, a PPP loan is forgivable if the borrower uses it for payroll costs or other approved purposes, retains employees, and does not cut wages. 15 U.S.C. § 9005(b), (d).

Congress instructed that PPP loans be administered by the SBA "under the same terms, conditions, and processes as a loan made under" the agency's established Section 7(a) loan program, unless Congress "otherwise provided." *Id.* § 636(a)(36)(B). To encourage lenders to offer PPP loans, Congress directed that the SBA "shall reimburse" lenders for the cost of making loans by paying loan processing fees based on the amounts of the loans. *Id.* § 636(a)(36)(P)(i).

In contrast to Congress's instruction that *lenders* "shall" receive a fee for processing PPP loans, the CARES Act says nothing about whether *agents* of lenders or applicants may charge or receive fees for assisting with PPP loans. The CARES Act addresses agent fees only once, in a provision titled "Fee Limits." *Id.* § 636(a)(36)(P)(ii). That provision states that agents "may not collect a fee in excess of the limits established by the [SBA]." *Id*. The CARES Act did not otherwise alter the SBA's existing scheme for regulating agents and their compensation.

4

C.      **The SBA's Implementation of the PPP**

Hours before the PPP application window opened, the SBA issued its Interim Final Rule (the "IFR") to guide how the PPP program would operate.  85 Fed. Reg. 20,811 (Apr. 15, 2020).

The IFR requires small businesses to complete a form—the Paycheck Protection Program Borrower Application Form (Form 2483), attached as Exhibit B—to apply for a PPP loan.  *See* 85 Fed. Reg. at 20,812.  Form 2483 is two pages long (excluding instructions and disclosures): the applicant need only provide basic identifying information; declare its average monthly payroll and number of employees; answer eight eligibility questions; and make certifications about its eligibility, the application's accuracy, and how loan proceeds will be used.  *See* Ex. B. Applicants are permitted to complete this straightforward form directly, and they need not obtain any agent's assistance. *See* 13 C.F.R. § 103.2(a).

As Congress directed, the IFR also limits the "total amount that an agent may collect" for "assistance in preparing an application for a PPP loan" as follows:

> **Who pays the fee to an agent who assists a borrower?**
>
> Agent fees will be paid by the lender out of the fees the lender receives from SBA.  Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed:
>
> > i. One (1) percent for loans of not more than $350,000;
> >
> > ii. 0.50 percent for loans of more than $350,000 and less than $2 million; and
> >
> > iii. 0.25 percent for loans of at least $2 million.
>
> The Act authorizes the Administrator to establish limits on agent fees.  The Administrator, in consultation with the Secretary, determined that the agent fee limits set forth above are reasonable based upon the application requirements and the fees that lenders receive for making PPP loans.

5

85 Fed. Reg. at 20,816.  Like the CARES Act, the IFR does not *require* lenders to pay fees to

any person who claims to be an agent of a borrower.  Nor does the IFR otherwise modify the

SBA's preexisting regulations in Part 103 governing agent fees.

> **D.     Plaintiffs Do Not Enter Into Compensation Agreements and Instead File**
> **These Lawsuits.**

After the IFR was published, the Association of International Certified Public

Accountants ("AICPA") cautioned CPAs that "there is a possibility that you will not be paid for

your services" assisting borrowers with PPP applications.  Ex. J.  The AICPA advised agents to

"discuss this issue with clients and the banks to ensure there is an understanding, preferably in

writing, as to how and when any fees will be paid."  *Id.*

Plaintiffs—accountants and accounting firms based in California, Florida, and

Pennsylvania—do not allege that they followed the AICPA's guidance.  Nor do they allege that

they entered into any agreement or even any understanding with any lender to pay them an agent

fee for their alleged work assisting PPP applicants.

Instead, Plaintiffs filed these five lawsuits.  Plaintiffs claim they are entitled to receive

agent fees from lenders for any purported help they provided to PPP loan applicants.  Plaintiffs

say this is so regardless of whether they identified themselves to or requested agent fees from

lenders—let alone entered into compensation agreements with lenders or obtained their approval

to assist PPP loan applicants.  According to Plaintiffs, the IFR *requires* lenders to pay them the

maximum permissible agent fee, regardless of whether any lender agreed to do business with

them or the amount of work Plaintiffs performed in connection with any particular application.[4]

---

[4] James Quinn seeks $8,607.37 from Chase and $2,740.90 from Signature; Fahmia seeks
$1,118.15 from Chase, $289 from Citibank, and $78 from Union Bank; and Johnson and Prinzo
seek $255.58 and $450.97, respectively, from Chase. *See* Quinn v. Chase SAC ¶¶ 36, 44, 55, 63;
Signature Am. Compl. ¶ 53; Union Compl. ¶ 47; Citi Compl. ¶ 47.

Although Plaintiffs allege that they helped clients apply for PPP loans from Defendants, their Complaints do not identify the names of their putative clients; what specific work Plaintiffs supposedly performed in connection with each alleged loan application; how much time Plaintiffs spent on that work; or Plaintiffs' hourly fees for such work.  Some Plaintiffs admit an agent cannot receive an agent fee unless "the agent submits the request for fee payment to the lender with the agent's fee based upon (a) the work performed for the client and (b) the caps on agent fees provided by the SBA's PPP regulations." *See, e.g.*, Union Compl. ¶ 35.  Yet Fahmia and Prinzo do not allege that they ever submitted such requests.  Quinn and Johnson do allege that they did so, but only after their clients' loans had been funded. *E.g.*, Quinn v. Chase Sec. Am. Compl. ("SAC") ¶¶ 36, 45–47; Signature Am. Compl. ¶ 54.  Thus, Plaintiffs effectively concede that no bank approved them as an agent before their alleged clients received their loans.

## PROCEDURAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  In ruling on this motion, this Court may consider all SBA materials attached as exhibits to this memorandum because they are "[p]ublic documents issued by government agencies."[5] *O'Neill v. Standard Homeopathic Co.*, 346 F. Supp. 3d 511, 519 n.1 (S.D.N.Y. 2018).

## ARGUMENT

## I.     THE CARES ACT DOES NOT ENTITLE AGENTS TO FEES FROM LENDERS.

Plaintiffs' claims all require them to demonstrate that the CARES Act requires lenders to pay a portion of their PPP loan processing fees to agents, regardless of what services the agents

---

[5] Unless otherwise noted, all internal citations and quotations marks have been omitted.

performed or whether the lenders agreed to pay such fees.  Plaintiffs' claims should be dismissed because neither the CARES Act nor its implementing regulations imposes any such requirement.

### A.     The CARES Act Does Not Require Lenders to Pay Fees to Agents.

Although Plaintiffs claim that "Congress" directed lenders to pay fees to agents that assisted with PPP loan applications, *e.g.*, Quinn v. Chase SAC ¶¶ 3–4, 24, the Complaints do not cite any provision of the CARES Act imposing such a requirement.  That is for good reason: no such requirement exists.

The CARES Act's only reference to agent fees *limits* those fees.  In that provision, Congress provided that "[a]n agent that assists an eligible recipient to prepare an application for a covered loan may not collect a fee in excess of the limits established by the Administrator."  15 U.S.C. § 636(a)(36)(P)(ii).  Plainly, a restriction on what fees an agent "may . . . collect" does not impose an affirmative duty on lenders to pay the maximum permissible fee.  *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) ("[I]t would be improper to conclude that what Congress omitted from the statute is nevertheless within its scope.").

When Congress intended to compensate parties involved in processing PPP loan applications, it did so explicitly.  In the subsection that immediately precedes the limitation on agent fees, Congress mandated that the SBA "*shall reimburse* a lender authorized to make a covered loan at a rate" based on the size of the loan.  15 U.S.C. § 636(a)(36)(P)(i) (emphasis added).  In other words, Congress identified who was entitled to receive fees (lenders), who was required to pay fees (the SBA), and the amount of that fee (a specified percentage of the loan amount).  No similar mandate appears with respect to the CARES Act's sole agent-fee reference.

"Where Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993).  The stark

difference between the CARES Act's neighboring provisions governing lender fees and agent

fees confirms that Congress did not guarantee every agent a right to receive compensation—

much less the maximum permitted amount—for work related to PPP loans.

**B.** **The CARES Act Directs the SBA to Implement the PPP Under the Section 7(a) Program, Which Has Clear Rules for Agent Compensation.**

The goal of the PPP was to provide liquidity to small businesses quickly.  Accordingly,

Congress directed the SBA to make PPP loans available under the agency's established Section

7(a) program.  *See* CARES Act § 1102 (amending 15 U.S.C. § 636(a)); 85 Fed. Reg. at 20,811–

12 (describing the PPP as a "new 7(a) program").  Congress further directed that "[e]xcept as

otherwise provided" in Section 636(a)(36), the SBA "may guarantee [PPP loans] under the *same*

*terms, conditions, and processes* as a loan made under" the existing Section 7(a) program.  15

U.S.C. § 636(a)(36)(B) (emphasis added).[6]

These existing "terms, conditions, and processes" include the requirement that agents

must "execute and provide to the SBA a compensation agreement" using the Form 159

Compensation Agreement before agents may receive "compensation charged for services

rendered . . . to the Applicant or lender in any matter involving SBA assistance."  13 C.F.R.

§ 103.5(b); *see also* 15 U.S.C. § 642 (requiring borrowers to identify agents before a loan is

made).  By requiring a compensation agreement to which the lender and applicant also are

parties *before* an agent may receive a fee, 13 C.F.R. § 103.5(a), the SBA made agent

compensation an issue to be settled by contract among the lender, applicant, and agent—not a

---

[6] Under the SBA's agreements with PPP lenders, the SBA will only guarantee loans if PPP lenders approve, close, disburse, service, and liquidate PPP loans in accordance with the "PPP Loan Program Requirements."  *See* Ex. D, §§ 2–5.  This includes requirements imposed on lenders by statute and SBA regulation, as well as "forms applicable to the 7(a) Loan Program."  *Id.*, § 2 (citing 13 C.F.R. § 120.10).

statutory or regulatory entitlement.   This approach provides important safeguards against unreasonable or excessive compensation, fraudulent agent-fee requests, and claims by debarred or otherwise ineligible agents.

When Congress legislates, it is presumed to do so against the backdrop of existing regulations.  *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.").  To be sure, the CARES Act expressly modified certain aspects of the existing Section 7(a) regime to enable lenders rapidly to make forgivable loans to businesses in need.  *See, e.g.*, 15 U.S.C. § 636(a)(2)(F) (requiring the SBA to fully guarantee PPP loans); *id.* § 636(a)(36)(D)(i) (expanding PPP eligibility to include nonprofits); *id.* § 636(a)(36)(F)(ii)(I) (giving all existing Section 7(a) lenders delegated authority to make and approve PPP loans).

But nothing in the text, structure, history, or purpose of the CARES Act suggests that Congress intended to exempt PPP loans from SBA's longstanding rules regulating agent compensation—including the requirement that an agent must enter into a "compensation agreement" with the lender before any agent fees may be paid, 13 C.F.R. § 103.5(a).  Congress therefore must be presumed to have intended that the existing regulatory scheme, which applies to "any matter involving SBA assistance," *id.*, cover PPP loans as well.  *See, e.g.*, *Citizens Against Casino Gambling in Erie Cty. v. Chaudhuri*, 802 F.3d 267, 287 (2d Cir. 2015) (Congress presumed to be familiar with existing regulatory regime).

It makes good sense that Congress left undisturbed the SBA's 24-year-old rule requiring lenders, agents, and applicants to negotiate acceptable fees among themselves.  "A person is not required to deal with another unless he so desires."  Restatement (First) of the Law of Restitution § 2 cmt. a.  And "one has no duty to pay for services officiously rendered without request

although resulting in benefit to him." Restatement (Second) of the Law of Agency § 441 cmt c.

That is why the AICPA recommended that agents "discuss" compensation "with clients and the

banks to ensure there is an understanding, preferably in writing, as to how and when any fees

will be paid." Ex. J at 3.

Congress's mandate that the SBA "*shall reimburse* a lender . . . at a rate" set forth in the

CARES Act reinforces this result. 15 U.S.C. § 636(a)(36)(P)(i) (emphasis added). By setting a

specific rate that lenders "shall" receive, Congress sought to encourage lenders to make PPP

loans and to compensate lenders for the costs they incurred in doing so on an expedited basis. At

the same time, by directing that PPP loans generally be made under the "same terms, conditions,

and processes" as other Section 7(a) loans, *id.* § 636(a)(36)(B), Congress left intact preexisting

rules designed to give lenders the freedom to decide whether to work with agents and how much

to pay them. A rule permitting self-described agents to demand a portion of the fees that lenders

"shall" receive would undermine this careful balance struck by Congress.

Plaintiffs' approach, which would eliminate the requirement that lenders, agents, and

applicants agree in advance on agents' compensation, raises numerous practical problems. For

example, under Plaintiffs' approach, agents would be compensated based solely on the loan

amount, regardless of the time allegedly expended, the services purportedly performed, or the

value of those services. And if agents need not explain or justify what work they performed,

agents would receive a fee simply by claiming they provided services (even if they did not).

This is a recipe for fraud. Similarly, if multiple agents claim they assisted with a single PPP loan

application, Plaintiffs' approach would seek to force lenders to pay an ever-increasing portion (if

not all) of their processing fees for individual loans, even if those agents were unknown to

lenders or never approved by them. Finally, because an agent, according to Plaintiffs, can

include "someone who prepares an applicant's application for financial assistance and is employed and compensated by the applicant," *e.g.*, Quinn v. Chase SAC ¶ 25, every PPP loan recipient could conceivably assert a claim to a share of the lender's processing fees based on the work of its own personnel, capturing a portion of the lender's congressionally mandated compensation for processing and extending the loan.  Neither Congress nor the SBA intended these absurd results.  *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 778–79 (2d Cir. 2002) (rejecting "a construction of [a] regulation [that] would lead to [an] absurd result").[7]

### C.    Plaintiffs' Reliance on the IFR and the Information Sheet Is Misplaced.

Because neither the CARES Act nor the SBA's implementing regulation supports Plaintiffs' theory, Plaintiffs rely instead on a contorted reading of the IFR and a related informal Information Sheet.  *E.g.*, Quinn v. Chase SAC ¶¶ 24–25.  Neither supports Plaintiffs' claims. And since a contrary reading would conflict with the CARES Act and the SBA's longstanding agent fee regulations, it must be rejected.  *See Lyng v. Payne*, 476 U.S. 926, 937 (1986) ("an agency's power is no greater than that delegated to it by Congress"); *Rosenberg v. XM Ventures*, 274 F.3d 137, 142 (3d Cir. 2001) ("the preferred construction of a statute and its regulations is one that gives meaning to all provisions").

### 1.    The IFR Does Not Entitle Agents to Receive Fees.

Nothing in the IFR requires lenders to pay fees to agents.  Rather, the IFR caps the "total amount that an agent *may* collect."  85 Fed. Reg. at 20,816 (emphasis added).  To the extent an agent "may" collect a fee, the IFR also directs that the fee "will be paid by the lender out of the fees the lender receives from SBA," not "from the borrower . . . or the PPP loan proceeds."  *Id.*

---

[7] To the extent Plaintiffs complain that the IFR prohibited them from seeking compensation directly from their clients, their complaint is with the mechanics of the PPP, not the lenders.  The CARES Act does not prohibit agents from seeking compensation from loan applicants, and the SBA's pre-existing Section 7(a) regulations permit agents to do so.  *See* 13 C.F.R. § 103.1(a).

Taken together, this language directs only that *if* an agent is to be compensated for assisting a borrower, such compensation must be paid by the lender, and then only up to the maximum amounts set forth in the IFR.

Plaintiffs also rely on an informal Information Sheet issued by the Treasury Department, but that informal guidance says nothing different.[8]  *See* Ex. E.  That short document simply paraphrases the CARES Act and the IFR by providing that *if* agents are to receive fees, those fees "will be paid out of lender" fees and "[t]he lender will pay the agent."  *Id.* at 2.  Like the CARES Act and the IFR, the Information Sheet does not guarantee that agents will receive fees. The Treasury Secretary confirmed as much when he testified recently that agent fees were "intended to be based upon a contractual relationship between the agent and the bank."  Ex. F.

### 2.    The SBA Did Not Change Its Longstanding Agent Fee Regulations.

Like Congress, the SBA has never signaled that its "compensation agreement" requirement does not apply to PPP loans.  Instead, the SBA's own regulations require that compensation agreements must be in place for "any matter involving SBA assistance," 13 C.F.R. § 103.5—which necessarily includes PPP loans.  The SBA has not "display[ed] awareness that it is changing its position," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), which confirms that the agency did not, in fact, alter course.

The PPP application process was simple and straightforward:  applicants needed to complete the two-page Form 2483 and submit limited supporting documentation.  85 Fed. Reg. at 20,816.  As Form 2483 states, "[t]he estimated time for completing this application, including gathering data needed, is 8 minutes."  Ex. B at 3.  SBA's regulations contemplate that small

---

[8] Even if it did, "interpretations contained in policy statements . . . lack the force of law." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000).

businesses may apply for Section 7(a) loans, including PPP loans, "without a representative," 13 C.F.R. § 103.2(a), which more than 97 percent of businesses do, *see* 85 Fed. Reg. at 7,627.

Had the SBA intended for every putative agent that claimed to have helped a PPP applicant to receive a fee even in the absence of a compensation agreement, it would have required loan applicants to identify those agents. But Form 2483 does not ask borrowers to identify agents that assisted them; that information must instead be provided on the traditional Form 159 Compensation Agreement. *See* Exs. A–B. While Plaintiffs try to blame lenders for not attempting to collect this information themselves, *e.g.*, Quinn v. Chase SAC ¶ 28, the SBA requires lenders to "as[k] for the same information (using the same language) as the [SBA's] Borrower Application Form." Ex. G. It makes no sense that the SBA would expect lenders to compensate every putative agent—regardless of whether a lender authorized an agent to provide assistance—if applicants were not asked on their PPP loan applications to identify whether agents helped with those applications.

The SBA form that lenders use to apply to the SBA for PPP loan guarantees, Form 2484, reaffirms this point. Unlike the *borrower* application form, the *lender* application form asks the *lender* to identify whether the *lender* used an agent. *See* Ex. C at Question K ("Is the Lender using a third party to assist in the preparation of the loan application or application materials, or to perform other services in connection with this loan?"). That the SBA asked lenders to identify lender-engaged agents, but did not ask borrowers to identify borrower-engaged agents, further confirms that the SBA did not intend every self-described agent to receive a fee from the lender.

Plaintiffs' proposed interpretation—which would permit agents to claim after-the-fact to have assisted borrowers with PPP applications, and to demand a portion of the lender's processing fee regardless of the services provided and without the lender's consent to do

14

business with that agent—invites fraud and abuse.  The Form 159 Compensation Agreement

provides a triple-check against fraud:  agents must certify that they have accurately described the

services provided, applicants must certify that the agent's representations about the services are

satisfactory, and lenders must certify that the agent fees charged are reasonable and satisfactory

given the certifications provided.  Ex. A at 2–3.  Lenders must also confirm that the agent is not

"debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from

participation in th[e] transaction by any Federal department or Agency."  *Id.*  Given the SBA's

concerns with agent-fee fraud,[9] there is no reason to conclude the agency intended to dispense

with this important anti-fraud safeguard, much less that it would do so without explanation.

Because Plaintiffs do not—and cannot—allege that they agreed with any Defendant regarding

their claimed agent fees, they are not entitled to any.

## II.     THE DECLARATORY JUDGMENT ACT AND COMMON LAW CLAIMS SHOULD BE DISMISSED FOR ADDITIONAL REASONS.

The fact that the CARES Act and its implementing regulation do not create any

entitlement for agent fees is fatal to all of Plaintiffs' claims.  In essence, Plaintiffs are asking for

a regulatory rewrite of the Section 7(a) loan program, which requires the action of Congress, not

judicial intervention.  But even if the Act could be read otherwise, Plaintiffs' claims still fail

because they have no cause of action to assert that right.

### A.     There Is No Private Right of Action to Enforce the CARES Act.

"[P]rivate rights of action to enforce federal law must be created by Congress."

*Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  And "the CARES Act does not expressly

---

[9] *See* Ex. I at 8–9 ("OIG investigations have revealed a pattern of fraud by loan packagers and other for-fee agents in the 7(a) Loan Program, involving hundreds of millions of dollars" and the SBA has "made substantial progress in developing effective methods to disclose and track loan agent activities on 7(a) program loans" by requiring the completion of Form 159 agreements).

provide a private right of action." *Profiles, Inc. v. Bank of Am. Corp.*, 2020 WL 1849710, at *4 (D. Md. Apr. 13, 2020).

Nor can Plaintiffs meet their "heavy burden" to overcome the "presumption that Congress did not intend" to create an implied private right of action. *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429, 433 (2d Cir. 2002). To begin, "the Small Business Act"—which the CARES Act amends—"does not provide . . . a private cause of action." *Aardwoolf Corp. v. Nelson Capital Corp.*, 861 F.2d 46, 48 (2d Cir. 1988); *accord Bulluck v. Newtek Small Bus. Fin., Inc.*, 808 F. App'x 698, 701 (11th Cir. 2020); *Crandal v. Ball, Ball & Brosamer, Inc.*, 99 F.3d 907, 909 (9th Cir. 1996); *Royal Servs., Inc. v. Maint., Inc.*, 361 F.2d 86, 92 (5th Cir. 1966).

Nothing in the CARES Act disturbs the Second Circuit's 30-year-old decision on this point. The "text and structure" of the CARES Act does not suggest, let alone "yield a clear manifestation," that Congress intended to create a private cause of action for anyone, including agents. *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011). Unsurprisingly, the only court to address whether the CARES Act created an implied private right of action held that it does not. *See Profiles*, 2020 WL 1849710, at *7.

The three factors that the Second Circuit considers in assessing whether private rights of action exist, *see Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007), confirm this conclusion. *First*, as the *Profiles* court observed, the Small Business Act codifies a robust criminal and civil enforcement regime. *See, e.g.*, 15 U.S.C. § 650(c). "[T]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others," such as a private right of action. *Bellikoff*, 481 F.3d at 116. *Second*, the absence of "rights-creating language" in the CARES Act for borrowers' agents "indicates a lack of congressional intent to create private rights of action." *Id.* Indeed, far from creating *rights* for

16

agents, the provision at issue creates a new *restriction*: it prohibits agents from collecting a fee greater than the limits set by the SBA.  "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons."  *Alexander*, 532 U.S. at 289.  Even if the agent fee-cap provision could somehow be read to create a right to fees (it cannot), Plaintiffs "still must show that the statute manifests an intent to 'create not just a private *right* but also a private *remedy*.'"  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002).  The CARES Act contains no such language.  *Finally*, the last *Bellikoff* factor—whether Congress provided a cause of action for enforcing one section of the statute, 481 F.3d at 116—is irrelevant because *no* provision of the Small Business Act confers a private right of action.  *See Profiles*, 2020 WL 1849710, at *11–13 (collecting authorities finding that "the [Small Business Act] does not contain a private right of action" and concluding that the CARES Act does not either).

### B.     The Lack of a Private Right of Action Defeats Plaintiffs' Declaratory Judgment Claims.

The Declaratory Judgment Act authorizes federal courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  Here, Plaintiffs seek a declaration, "in accordance with the CARES Act and the PPP regulations . . . that Defendants are obligated to set aside money to pay, and pay, third-party agents . . . for the work performed on behalf of a client in relation to the preparation and/or submission of a PPP loan application that resulted in a funded PPP loan."  *E.g.*, Quinn v. Chase SAC ¶ 78.

However, "the operation of the Declaratory Judgment Act is procedural only."  *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937).  The "availability of [declaratory] relief presupposes the existence of a judicially remediable right."  *Schilling v. Rogers*, 363 U.S. 666,

677 (1960).  Accordingly, "a court may only enter a declaratory judgment in favor of a party

who has a substantive claim of right to such relief."  *In re Joint E. & S. Dist. Asbestos Litig.*, 14

F.3d 726, 731 (2d Cir. 1993).  Because Plaintiffs lack a substantive cause of action under the

CARES Act, they may not seek declaratory relief to enforce any CARES Act requirement.  *See,*

*e.g.*, *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244–45 (2d Cir. 2012) (dismissing Declaratory

Judgment Act claim that lacked a "valid legal predicate").

> **C.**     **The Lack of a Private Right of Action Defeats Plaintiffs' Common-Law**
>            **Claims.**

Unable to invoke a federal cause of action, Plaintiffs assert a grab bag of state common-

law claims as a fallback.  But when a plaintiff's suit is "in essence a suit to enforce" a federal

statute lacking a private right of action, it is "incompatible with the statutory regime" to allow

common-law claims predicated on alleged violations of that federal standard.  *Astra USA, Inc. v.*

*Santa Clara County*, 563 U.S. 110, 118 (2011).  Such common-law claims "are clearly an

impermissible 'end run' around" the non-existent federal private right of action.  *Grochowski v.*

*Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003).

For example, in *Broder v. Cablevision Systems*, 418 F.3d 187 (2d Cir. 2005), the plaintiff

sought to use claims for declaratory relief, breach-of-contract, and unjust enrichment to enforce a

federal legal standard for which he had no federal cause of action.  The Second Circuit rejected

this effort, holding that "a federal court should not strain to find in a contract a state-law right of

action for violation of a federal law under which no private right of action exists," *id.* at 198, and

that an unjust enrichment claim is "properly dismissed as an effort to circumvent the legislative

preclusion of private lawsuits for violation of the statute," *id.* at 203.

Nothing separates *Astra USA*, *Grochowski*, and *Broder* from this case.  As in those cases,

Plaintiffs allege no independent common-law right to agent fees, but seek to use common-law

claims to enforce alleged violations of federal law for which they have no federal cause of action.  This Court should reject Plaintiffs' attempt to use common-law claims to bootstrap their way into a cause of action that the CARES Act does not give them.[10]

### D.    The Common-Law Claims Are Defective for Additional Reasons.

#### 1.    Plaintiffs' Third-Party Beneficiary Breach-of-Contract Claims Fail.

The only agreement referenced in the Complaints between each Defendant, on the one hand, and the SBA, on the other hand, is the "CARES Act Section 1102 Lender Agreement"—a four-page form agreement allegedly between PPP lenders and the SBA setting forth the parties' respective obligations under the PPP.  *See* Ex. D.[11]  Even assuming that defendants entered into these agreements, Plaintiffs do not—and cannot—contend that *they* are parties to these agreements.  Instead, they allege that they may sue as third-party beneficiaries of these Lender Agreements, on the theory that Defendants' failure to pay agent fees violated their promise that Defendants would adhere to all PPP rules and regulations.  *E.g.*, Quinn v. Chase SAC ¶¶ 81–84.

For a party to qualify as a third-party beneficiary, the contract must "clearly evidence an intent to permit enforcement by the third party in question."  *Hillside Metro Assocs., LLC* v. *JPMorgan Chase Bank, Nat. Ass'n*, 747 F.3d 44, 49 (2d Cir. 2014).  That standard is even more exacting for government contracts, for which courts apply the "basic contract principle that third party beneficiaries of a Government contract are generally assumed to be merely *incidental*

---

[10] *Aardwoolf Corp. v. Nelson Capital Corp.*, 861 F.2d 46 (2d Cir. 1988), is not to the contrary. There, the Second Circuit held that a plaintiff could assert common-law claims based on alleged violations of the SBA's cost-of-money regulations.  *Id.* at 48-49.  But the SBA regulations at issue in *Aardwoolf* "merely reinforce[d] common-law State standards already in existence," *id.* at 49; there is no corresponding common-law right here for agents to receive fees in the absence of a pre-existing agreement.

[11] Federal common law governs a federal governmental contract, *Hillside Metro Assocs., LLC* v. *JPMorgan Chase Bank, Nat. Ass'n*, 747 F.3d 44, 49 (2d Cir. 2014), and the Lender Agreement states it is "to be interpreted under and construed in accordance with federal law," Ex. D, § 10.F.

beneficiaries, and may not enforce the contract absent clear intent to the contrary." *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 288 (D.C. Cir. 1993); *see also Gorbaty v. Wells Fargo Bank, N.A.*, 2012 WL 1372260, at *15 (E.D.N.Y. Apr. 18, 2012) ("the precise language of the contract must demonstrate a clear intent to permit third parties *to enforce the contract*").

Where, as here, Congress did not provide a private right of action to enforce putative rights under a statute, a nonparty may not sue as an intended third-party beneficiary to a federal government contract that "simply incorporate[s] statutory obligations and record[s] the . . . agreement to abide by them." *Astra USA*, 563 U.S. at 117–18. Yet that is Plaintiffs' entire theory. They identify no provision of the Lender Agreement imposing any independent obligation to pay agent fees, and there is none. In fact, the Lender Agreement does not refer to "agents" at all. Because it does not contain anything that "clearly evidence[s] an intent to permit enforcement" by Plaintiffs, *Hillside Metro Assocs.*, 747 F.3d at 49, and does not confer the right to payment they allege, the breach-of-contract claims based on the Lender Agreement should be dismissed.

Plaintiffs' related claims against Chase—based on their contention that they are third-party beneficiaries of the separate loan agreements involving PPP borrowers—fail for similar reasons. Under Ohio law,[12] "[t]hird parties that are only incidental beneficiaries are generally not permitted to assert claims under contracts to which they are not parties," and "there must be evidence" in the agreement itself "that the contract was intended to directly benefit that third party." *Cook v. Ohio Nat'l Life Ins. Co.*, 961 F.3d 850, 856 (6th Cir. 2020). No such evidence exists: there is no reference in those agreements to agents, either.

---

[12] The note for Chase's PPP loans stated that the loan is governed by federal law if SBA is the holder or by the laws of the state of the lender's main office, *i.e.*, Ohio for Chase. *See* Ex. L, § 9.

### 2.    Plaintiffs' Unjust Enrichment Claims Fail.

"[U]njust enrichment is not a catchall cause of action to be used when others fail."

*Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012).  Rather, "[t]o state a claim for unjust

enrichment under New York law, Plaintiffs must plead facts showing that (1) defendant was

enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against

permitting defendant to retain what plaintiff is seeking to recover."  *Mount v. PulsePoint, Inc.*,

684 F. App'x 32, 36 (2d Cir. 2017).  Plaintiffs cannot satisfy any of these elements.[13]

Although Plaintiffs must allege that they conferred a "specific" and "direct" benefit on

Defendants, *In re Bayou Hedge Funds Invest. Litig.*, 472 F. Supp. 2d 528, 531–32 (S.D.N.Y.

2007), they cannot do so here.  At most, Plaintiffs allege that they conferred a benefit on the PPP

borrowers they allegedly assisted—not on Defendants.  To the extent Plaintiffs contend that

Defendants received a benefit in the form of PPP lender fees, those fees were paid by the SBA—

not by Plaintiffs.  For this reason alone, Plaintiffs' unjust enrichment claims should be dismissed.

*See, e.g.*, *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (plaintiff did not confer direct and

specific benefit on defendant by making loan to defendant's husband); *Bayou Hedge Funds*, 472

F. Supp. 2d at 532 (no unjust enrichment where defendant was not paid from money that

"belonged to or came from plaintiffs").

Plaintiffs also cannot satisfy the "equity and good conscience" element.  "There can be

no enrichment that is unjust where there is no relationship that causes reliance or inducement."

*J.P. Plumbing Corp. v. Born to Build Const. Corp.*, 27 N.Y.S.3d 203, 205 (2d Dep't 2016).

---

[13] Fahmia and Johnson are alleged to be California citizens.  Under California law, unjust enrichment claim requires that: (1) the defendant received a benefit that was (2) unjustly retained at the expense of the plaintiff.  *Mangindin v. Wash. Mut. Bank*, 637 F. Supp. 2d 700, 711 (N.D. Cal. 2009).  If California law governs these Plaintiffs' unjust enrichment claims, the claims fail on both elements for the reasons the New York claims fail.

Plaintiffs do not (and cannot) allege that they had a "sufficiently close relationship" with Defendants to "have caused reliance or inducement." *Schroeder v. Pinterest Inc.*, 17 N.Y.S.3d 678, 690 (1st Dep't 2015).  To the contrary, there is no allegation that Defendants were even aware of Fahmia's, Prinzo's, or Johnson's alleged assistance to PPP applicants, or that Defendants approved Quinn's alleged assistance, before those applications were submitted. Plaintiffs claim they had a relationship with their clients and that their clients had a separate relationship with Defendants, but these separate relationships are "too attenuated and insufficient to have caused reliance or inducement." *Id.*

Likewise, "[a] claim for unjust enrichment does not lie to relieve a party of the consequences of the party's own failure to . . . exercise caution with respect to a business transaction." *Dragon Inv. Co. II LLC v. Shanahan*, 854 N.Y.S.2d 115, 118 (1st Dep't 2008). There is no inequity in Plaintiffs' suffering the consequences of their failure to attempt compliance with the existing regulatory scheme that requiring agents, lenders, and applicants to negotiate compensation agreements.  *See also Hudson & Broad, Inc. v. J.C. Penney Corp.*, 2013 WL 3203742, at *5–6 (S.D.N.Y. June 18, 2013) (rejecting Plaintiffs' "free ride" theory, noting that "there is no expectation of payment where plaintiff may have performed preparatory work in anticipation of and to facilitate a successful contract negotiation, but no written contract was finalized").  Furthermore, it cannot be "unjust" or "inequitable" for Defendants to retain reimbursements Congress specifically directed that they "shall" receive as compensation for the resources and effort they expended in processing PPP loans.  15 U.S.C. § 636(a)(36)(P)(i); *cf. Marcus v. AT&T Corp.*, 138 F.3d 46, 64 (2d Cir. 1998) (unjust enrichment claim failed where defendant charged rates "that it is required by law to charge").

### 3.   Plaintiffs' Conversion Claims Fail.

Plaintiffs also assert conversion claims against Defendants. "A conversion claim cannot be based only on the allegation that a defendant received money and failed to remit payment to the plaintiff," *Lynn v. Maida*, 97 N.Y.S.3d 46, 48 (1st Dep't 2019), but that is all Plaintiffs allege. To assert a claim for conversion of money, New York law "*requires* the plaintiff to have ownership, possession or control of the money *before* its conversion." *Traffix, Inc. v. Herold*, 269 F. Supp. 2d 223, 228 (S.D.N.Y. 2003) (emphases added). Here, however, Plaintiffs do not and could not claim that they ever had possession of the "agent fees" to which they claim to be entitled; instead, they argue that they "have a right to immediate possession of the agent fees" that they say should be paid out of lender fees paid by the SBA to the lenders. Quinn v. Chase SAC ¶ 114. Such an interest, even if it were valid, is insufficient to maintain a conversion claim. *See, e.g.*, *Komlossy v. Faruqi & Faruqi, LLP*, 2017 WL 722033, at *10 (S.D.N.Y. Feb. 23, 2017) (dismissing conversion claim because "[a]t best, Plaintiff alleges that she possessed a contractual right to the future fee commission"), *aff'd on other grounds*, 714 Fed. App'x 11 (2d Cir. 2017); *Traffix*, 269 F. Supp. 2d at 225 (dismissing conversion claim because "an equitable interest" is not enough); *Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 537–38 (E.D.N.Y. 2017) (no claim for conversion over Uber's failure to forward tips because drivers "have not alleged that they had ownership, possession, or control of their gratuities before their alleged conversion" because "[a]ny gratuity paid by a rider went directly to Uber, not [drivers].").[14]

---

[14] Plaintiffs' conversion claims fail under California law for an additional reason: "California cases permitting an action for conversion of money typically involve those who have misappropriated, commingled, or misapplied specific funds held for the benefit of others" where "the amount of money converted was readily ascertainable." *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 396 (2007) (citing cases); *see also McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1491–92 (2006) (no conversion where defendants did not "hold[] their payments on behalf of another, in essence in trust"). Plaintiffs cannot allege that Defendants are obligated to return a particular bundle of currency to agents.

### 4.     Plaintiffs' Misappropriation Claims Against Chase Fail.

Plaintiffs' misappropriation claims against Chase should be dismissed for two reasons.

*First,* "[a] misappropriation claim is the same as an unfair competition claim under New York law." *Diamond Collection, LLC v. Underwraps Costume Corp.*, 2018 WL 1832928, at *9 (E.D.N.Y. Apr. 16, 2018).  A plaintiff must allege that the defendant "misappropriate[d] the results of the skill, expenditures and labors *of a competitor*" and used "plaintiff's property *to compete* against the plaintiff's own use of the same property."  *N. Am. Olive Oil Ass'n v. D'Avolio Inc.*, 2020 WL 2079421, at *12 (E.D.N.Y. Apr. 30, 2020) (emphases added).

Plaintiffs have not established—and cannot establish—that Chase has acted as their competitor.  To the contrary, the Complaint makes clear that PPP lenders and agents serve complementary—not competitive—roles in assisting borrowers in obtaining PPP loans.  The misappropriation claim accordingly should be dismissed.  *See Coca-Cola N. Am. v. Crawley Juice, Inc.*, 2011 WL 1882845, at *7 (E.D.N.Y. May 17, 2011) (dismissing misappropriation counterclaim where defendants did not allege that they were plaintiff's "rivals").

*Second*, Plaintiffs do not and cannot allege that Chase used their property for an act of competition in "bad faith."  *See Nat'l Air Cargo Grp., Inc. v. Maersk Line Ltd.*, 2019 WL 4735426, at *10 (S.D.N.Y. Sept. 27, 2019).  Plaintiffs assert in conclusory fashion that "[a]cting in bad faith, Defendants have refused to pay . . . their statutorily mandated fees," *e.g.*, Quinn v. Chase SAC ¶ 117, but have pled "no facts supporting" the bad faith allegation, defeating their claims.  *See Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 330–31 (E.D.N.Y. 2014) (conclusory allegation of bad-faith conduct insufficient); *Bulger v. Royal Doulton, PLC,* 2006 WL 3771016, at *8 (S.D.N.Y. Dec. 19, 2006) (similar).

## III.     THE CLAIMS FOR VIOLATIONS OF NEW YORK'S GBL § 349 FAIL.

Plaintiffs attempt to bring claims against Chase, Citibank, and Signature under New York

General Business Law ("GBL") § 349(a), which prohibits "[d]eceptive acts or practices."  These claims fail because these Plaintiffs lack statutory standing and do not satisfy any of the elements of a GBL § 349 claim.

### A.    Plaintiffs Lack Statutory Standing to Bring Their GBL § 349 Claims.

To establish standing under GBL § 349, a plaintiff must show that "the transaction in which the consumer is deceived . . . occur[red] in New York."  *Goshen v. Mut. Life Ins. Co. of New York*, 98 N.Y.2d 314, 324 (2002).  A plaintiff does not have standing "just because he or she transacted" with a New York defendant or "received advertisements" or other communications sent from New York.  *Wright v. Publishers Clearing House, Inc.*, — F. Supp. 3d —, 2020 WL 729884, at *6 (E.D.N.Y. Feb. 13, 2020).  Instead, "transactions occur where the [plaintiff] viewed the advertisement or purchased the product."  *Id.* at *7; *see, e.g.*, *Goshen*, 98 N.Y.2d at 326 (where plaintiff purchased insurance policy, paid premiums, and received information in Florida, "any deception took place in Florida, not New York").

Here, none of the Plaintiffs asserting GBL § 349 claims allege that they received or viewed any alleged misrepresentations in New York.  Indeed, no Plaintiff conducts their business in New York.  *See, e.g.*, Quinn v. Chase SAC ¶¶ 6–9 (alleging that Johnson, Quinn, Fahmia, and Prinzo have principal places of business in California, Florida, California, and Pennsylvania, respectively).  Accordingly, Plaintiffs lack statutory standing.

### B.    Plaintiffs Cannot Satisfy Any of the Elements of a GBL § 349 Claim.

Plaintiffs also cannot satisfy any of the three elements of a GBL § 349 claim: (1) an act or practice that is "consumer-oriented," (2) is misleading in a material respect, and (3) injured the plaintiff as a result.  *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009).

*First*, Plaintiffs cannot allege any "consumer-oriented" acts or practices.  "Business-to-business transactions and private contract disputes unique to the parties do not typically give rise

to section 349 claims." *In re Libor-Based Fin. Instr. Antitrust Litig.*, 2015 WL 4634541, at *84

(S.D.N.Y. Aug. 4, 2015).  Although Plaintiffs allege that Defendants made misrepresentations

about whether and under what circumstances they would pay agent fees, any such statements do

not relate to or affect the purchase of "goods and services for personal, family, or household

use." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *92 (S.D.N.Y.

Oct. 20, 2015).  Instead, Plaintiffs are sophisticated businesses that can deal with Defendants "at

arm's length" and "obtain independent financial and legal advice." *In re LIBOR*, 2015 WL

6243526, at *93.  Indeed, they are in the business of providing such advice to their own clients.

Accordingly, they are not the types of "unwary 'consumers'" that GBL § 349 is intended to

protect.[15] *Id.*; *see also Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 743 (S.D.N.Y. 2012) (finding

plaintiffs were "not 'consumers' in any reasonable interpretation of the word").

     *Second*, there is no "materially misleading" act, meaning an act that is "likely to mislead

a reasonable consumer acting reasonably under the circumstances." *Spagnola*, 574 F.3d at 74.

"This inquiry is an objective one, which . . . may be resolved as a matter of law on a motion to

dismiss." *Kommer v. Bayer Consumer Health*, 252 F. Supp. 3d 304, 311 (S.D.N.Y. 2017).  Here,

Plaintiffs rely exclusively on purported language from: (1) Citibank's website stating that

Citibank was (a) "processing the applications submitted to us in conformity with PPP rules and

under guidance from the [SBA]" and (b) "adhering to the risk and regulatory guidelines that

---

[15] Plaintiffs suggest that the alleged misrepresentations affect "the public at large" because their fees are paid from the "income taxes of New Yorkers, and the public at large" and because the alleged statements supposedly "interfered with" the Congressional goals of the PPP. *E.g.*, Quinn v. Chase SAC ¶ 98.  But it is not sufficient that an act has an incidental effect on "the public at large" or "taxpayers"; the practice must involve a "consumer-oriented" transaction—and here it does not.  *See, e.g.*, *Libor-Based Fin. Instr. Antitrust Litig.*, 2015 WL 4634541, at *93 (misrepresentations about "interest rate swaps," which are not "a product that individuals purchase for 'personal, family or household use,'" outside GBL § 349's scope).

govern our lending programs," Citi Compl. ¶¶ 38, 77; and (2) Chase's and Signature's websites

saying that "[i]f an agent assists the borrower, the lender will compensate the agent out of the fee

it receives from the SBA, at a rate of 0.25%-1% of the loan amount, depending on its size,"

Quinn v. Chase SAC ¶ 95 & n.8; Signature Am. Compl. ¶ 81.[16]

Plaintiffs argue that these statements were misleading because Defendants allegedly

refused to pay agent fees.  But the purported statements from Citibank's website cited by

Plaintiffs do not even mention agent fees at all, much less would they mislead a "reasonable

consumer" into believing that Citibank would pay agent fees upon request.  Likewise, the

purported statements from Chase's and Signature's websites merely reflect that lenders may pay

fees to agents that properly document their assistance, submit a proper request for fees, and

obtain the lender's agreement to compensate an agent.  No "reasonable consumer" would be

misled into believing that *any* agent fees would be paid upon request, regardless of whether the

agent complied with the relevant requirements—such as the requirement to obtain lender

approval.

*Finally*, Plaintiffs have not alleged "causation," *i.e.*, that "the defendant's material

deceptive act caused the injury."  *Gale v. Int'l Bus. Mach. Corp.*, 781 N.Y.S.2d 45, 47 (2d Dep't

2004).  Plaintiffs claim that they were "deprived of agent fees" to which they are allegedly

entitled.  *E.g.*, Quinn v. Chase SAC ¶ 97.  But Plaintiffs do not allege that they saw or were even

aware of the alleged misrepresentations on Defendants' websites before they assisted their clients

in applying for PPP loans, let alone that they relied on those statements.  "If [Plaintiffs] did not

see any of these [allegedly misleading] statements, they could not have been the cause of

---

[16]  The purported Signature statement is actually attributed to the Chase website.  *See* Signature
Am. Compl. ¶ 81; Def. Signature Bank's Supp. Mem. in Further Support of Mot. to Dismiss.

[Plaintiffs'] injury, there being no connection between the deceptive act and the [Plaintiffs']

injury." *Bibicheff v. PayPal, Inc.*, 2020 WL 2113373, at *4 (E.D.N.Y. May 4, 2020).

## IV.   THE CLAIM FOR VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW FAILS.

Fahmia's claim against Union Bank under California's Unfair Competition Law ("UCL")

should be dismissed for lack of statutory standing and failure to state a claim.

To have standing under the UCL, a plaintiff must "establish a loss or deprivation of

money or property sufficient to qualify as injury in fact, i.e., economic injury."  *Kwikset Corp. v.*

*Superior Court*, 51 Cal. 4th 310, 322 (2011). As discussed below, Fahmia does not allege that it

requested an agent fee from Union Bank and had that request denied.  Accordingly, even

crediting Fahmia's erroneous claim of entitlement to agent fees, it has suffered no injury-in-fact

and therefore lacks UCL standing.

Fahmia's UCL claim also fails because Fahmia does not allege any "unlawful" or

"unfair" business practices.  *See* Union Compl. ¶¶ 75–81 (asserting claims under these prongs of

the UCL).  For the reasons discussed above, Fahmia has not pled any violation of the CARES

Act or SBA regulations governing the PPP, and he cites no other law that would make it

"unlawful" for Union Bank to deny him agent fees.  *See Flores v. EMC Mortg. Co.*, 997

F. Supp. 2d 1088, 1117–19 (E.D. Cal. 2014) (dismissing "unlawful" UCL claim where plaintiff

pled no violation of law).  Moreover, failing to pay an agent fee that Fahmia never requested and

that Union Bank does not owe is not "unfair."  *See Swain v. CACH, LLC*, 699 F. Supp. 2d 1117,

1122 (N.D. Cal. 2009) (dismissing "unfair" UCL claim where plaintiff had not "lost any money

or property in which she had a vested interest").

## V.   THE COMPLAINTS CANNOT STATE A CLAIM AGAINST THE HOLDING COMPANY DEFENDANTS.

Plaintiffs name as defendants Citigroup, Inc., JPMorgan Chase & Co., and MUFG

Americas Holding Company, all of which are financial holding companies (the "Holding

Company Defendants").  Although Plaintiffs allege generally that "Defendants" made PPP loans

but refused to pay agent fees to Plaintiffs, they do not specifically allege that any Holding

Company Defendant actually made any PPP loans.  Nor could they, as none of these entities

makes or funds PPP loans, and none of them appears on the SBA's list of eligible PPP lenders.

*See* SBA, Lenders Participating in PPP by State (June 25, 2020), *available at*

https://www.sba.gov/sites/default/files/2020-06/PPP_Lender_List_200625.pdf.  Accordingly,

Plaintiffs' allegations do not apply to the Holding Company Defendants, and the claims against

them should be dismissed.  *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y.

2016) ("Mere generalizations as to any particular defendant—or even defendants as a group—are

insufficient [to state a claim].  The fact that two separate legal entities may have a corporate

affiliation . . . does not alter this pleading requirement.").

## VI.   THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER CLAIMS BY FAHMIA AND PRINZO, WHO NEVER ASKED DEFENDANTS FOR FEES.

Finally, this Court lacks subject matter jurisdiction over all of Fahmia's claims against

Chase, Citibank, and Union Bank and over Prinzo's claims against Chase.  These Plaintiffs do

not allege that they made any requests for agent fees that any Defendant denied.  Accordingly,

these claims should be dismissed under Rule 12(b)(1) for lack of standing and ripeness.[17]

Fahmia admits that agents are not eligible for fees until "the agent submits the request for

fee payment to the lender with the agent's fee based upon . . . the work performed."  Union

Compl. ¶ 35; Citi Compl. ¶ 35.  This is a logical requirement: it provides a lender with the notice

---

[17] A facial challenge to the Court's subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) is evaluated under a  "substantively identical" standard to Rule 12(b)(6).  *Doe No. 1 v. Putnam County*, 344 F. Supp. 3d 518, 526 (S.D.N.Y. 2018).

and information necessary to pay the agent fee.  It also conforms with the law: the SBA requires

certain steps, including execution of a Form 159 Compensation Agreement, before any agent fee

may be paid. 13 C.F.R. § 103.5(b).

Despite this critical admission, neither Fahmia nor Prinzo alleges that it actually

requested an agent fee that was denied by any of these Defendants.  Without any allegation of a

request made and denied, there is no injury traceable to these defendants to confer standing.

On similar facts, courts have denied standing to plaintiffs who never applied for—and

therefore were never denied—the benefits they sought through litigation.  *See, e.g.*, *Doe v. Blum*,

729 F.2d 186, 189–90 (2d Cir. 1984) (plaintiffs who did not allege "any attempt to obtain

services . . . or the denial of those services" lacked standing to pursue declaratory relief);

*Ciaramella v. Zucker*, 2019 WL 4805553, at *6 (S.D.N.Y. Sept. 30, 2019) (no standing where

"as of the filing of the complaint neither [plaintiff] had yet been denied coverage" under policy).

Fahmia's and Prinzo's failure to allege that they were ever denied a requested fee by

these banks also means their claims are not ripe because their alleged harm is simply "too

hypothetical and speculative a threat to warrant judicial intervention." *Empire State Pharm.*

*Soc., Inc. v. Perales*, 672 F. Supp. 146, 149 (S.D.N.Y. 1987).  Courts regularly dismiss plaintiffs'

claims as unripe in analogous circumstances.  *See, e.g.*, *King's Gym Complex, Inc. v. Phila.*

*Indem. Ins. Co.*, 433 F. Supp. 2d 256, 260 (N.D.N.Y. 2006) ("If plaintiff failed to submit a claim,

then a claim was not—could not—have been denied, and the dispute is not ripe for

adjudication."), *aff'd*, 314 F. App'x 342 (2d Cir. 2008); *Empire State Pharm.*, 672 F. Supp.

at 149 (finding medical providers' challenge to new reenrollment procedures unripe "[s]ince the

[defendant] has not denied any reenrollment applications").  This Court should do the same.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Complaints in their entirety.

Dated:  July 10, 2020          Respectfully submitted,

**COVINGTON & BURLING LLP**


By:  <u>/s/ Andrew Soukup*</u>
      Andrew Soukup

      Andrew Soukup (*pro hac vice*)
      S. Conrad Scott
      Calvin Cohen
      850 Tenth Street, NW
      Washington, DC 20001
      (202) 662-6000
      asoukup@cov.com
      cscott@cov.com
      ccohen@cov.com

      Ashley M. Simonsen (*pro hac vice*)
      Brittany L. Benjamin
      1999 Avenue of the Stars
      Los Angeles, CA 90067
      (424) 332-4800
      asimonsen@cov.com
      bbenjamin@cov.com


      *Attorneys for Defendants MUFG Union Bank, N.A.*
      *and MUFG Americas Holdings Corporation*


**GREENBERG TRAURIG**


By:  <u>/s/ Sylvia E. Simson*</u>
      Sylvia E. Simson

      Sylvia E. Simson
      Keith Hammeran
      Noah Lindenfeld
      200 Park Avenue, 39th Floor, Suite 39-36
      New York, NY 10166
      (212) 801-9275

      simsons@gtlaw.com
      hammerank@gtlaw.com
      lindenfeldn@gtlaw.com

Paul J. Ferak (*pro hac vice*)
ferakp@gtlaw.com
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
(312) 456-8400
ferakp@gtlaw.com

*Attorneys for Defendants JPMorgan Chase Bank, N.A.; and JPMorgan Chase & Co.*

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:   /s/ Elizabeth M. Sacksteder*
     Elizabeth M. Sacksteder

     Elizabeth M. Sacksteder
     1285 Avenue of the Americas
     New York, NY 10019
     (212) 373-3000
     esacksteder@paulweiss.com

*Attorney for Defendant Signature Bank*

**MAYER BROWN LLP**

By:   /s/ Lucia Nale*
     Lucia Nale

     Christopher J. Houpt
     1221 Avenue of the Americas
     New York, NY 10020
     (212) 506-2374
     choupt@mayerbrown.com

     Lucia Nale (*pro hac vice*)
     Thomas V. Panoff (*pro hac vice*)
     Christopher S. Comstock (*pro hac vice*)
     Andrew J. Spadafora (*pro hac vice*)
     71 South Wacker Drive
     Chicago, IL 60606
     (312) 782-0600
     lnale@mayerbrown.com

32

tpanoff@mayerbrown.com
ccomstock@mayerbrown.com
aspadafora@mayerbrown.com

*Attorneys for Defendants Citibank, N.A.; and Citigroup Inc.*

*\* Signature used with permission pursuant to SDN ECF Rule 8.5(b)*

33

APPENDIX:  TABLE OF CLAIMS

| | Quinn v. Chase Second Am. Compl. (Case No. 1:20-cv-4100) | Signature Am. Compl. (Case No. 1:20-cv-4144) | Union Compl. (Case No. 1:20-cv-4145) | Citi Compl. (Case No. 1:20-cv-4146) | Johnson v. Chase Am. Compl. (Case No. 1:20-cv-4858) |
|---|---|---|---|---|---|
| **Declaratory Judgment** | Count I (¶¶ 75–78) | Count I (¶¶ 68–71) | Count I (¶¶ 60–68) | Count I (¶¶ 64–67) | Count I (¶¶ 75–78) |
| **Breach of Contract (Third-Party Beneficiary) (Agreements between Defendants and SBA)** | Count II (¶¶ 79–85) | Count II (¶¶ 72–77) | Count II (¶¶ 69–74) | Count II (¶¶ 68–73) | Count II (¶¶ 79–85) |
| **Breach of Contract (Third-Party Beneficiary) (Agreements Between Defendants and Borrowers)** | Count III (¶¶ 86–91) | | | | Count III (¶¶ 86–91) |
| **N.Y. GBL § 349** | Count IV (¶¶ 92–101) | Count III (¶¶ 78–86) | | Count III (¶¶ 74–82) | Count IV (¶¶ 92–101) |
| **Cal. UCL** | | | Count III (¶¶ 75–81) | | |
| **Unjust Enrichment** | Count VI (¶¶ 110–13) | Count IV (¶¶ 87–91) | Count IV (¶¶ 82–86) | Count IV (¶¶ 83–87) | Count VI (¶¶ 110–13) |
| **Conversion** | Count V (¶¶ 102–09) | Count V (¶¶ 92–99) | Count V (¶¶ 87–94) | Count V (¶¶ 88–95) | Count V (¶¶ 102–09) |
| **Misappropriation** | Count VII (¶¶ 114–18) | | | | Count VII (¶¶ 114–18) |